## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| TERRY HEGGS, | Case No. 20-cv-2302 (KMM/ECW) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| DEPARTMENT OF CORRECTIONS; C.O. FITZ; C.O. WAGNER, O.I.C.; C.O. PADELFORD; C.O. BROWN; SRG. EMILY; SRG. LASEN; AND SRG. SUGRAY, | |
| Defendants. | |

This matter comes before the Court on Defendants' Motion for Summary Judgment. (Dkt. 21.)  The case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For the following reasons, the Court recommends granting summary judgment to Defendants.

### I.      FACTUAL BACKGROUND

#### A.     Complaint's Allegations

Plaintiff Terry Heggs ("Heggs" or "Plaintiff") was incarcerated at MCF-Stillwater from September 2020 until his release in March 2021.  (Dkt. 19; Dkt. 30 ¶ 4.)  On November 10, 2020, Heggs filed a Complaint (dated November 1, 2020) for violations of his civil rights under 42 U.S.C. § 1983.  (Dkt. 1.)  The statement of the claim was that

Defendants Minnesota Department of Corrections ("MNDOC"), C.O. Fitz, CO./O.I.C. Wagner, C.O. Padelford, C.O. Brown, Sergeant Emily, Sergeant Lasen, Sergeant Sugray, and Sergeant Julian were:

> Not helping the spread of Covid 19, by not giving us cleaning supplys [sic], no wearing their mask as mandated, removing the napkins from dispensery [sic] so we cant us [sic] them to clean tables as well as touch handles, washer/dryer doors, to help not spread germs on things. Leaving huge bags of nasty dripping trash all over the unit, not giving cleaning supplys [sic], tissue. Not helping stop the spread of Covid 19, not answering Kite or grievances. Keeping us lockdown every chance they get, but not helping prevent Covid 19. No allowing kitchen to get Alt. Meals. Not moving people who tested positive for Covid.

(Dkt. 1 at 4-5.)[1] Heggs seeks compensatory damages and an order requiring the termination or suspension of the individual employees. (Dkt. 1 at 5.) Heggs also made the following allegations:

## 1.     Allegations Against the Minnesota Department of Corrections

The MNDOC violated his rights under the Fifth, Eighth, and Thirteenth Amendments. (Dkt. 1-1 at 1.) In September 2020, he was not given a mask for a week until they brought an inmate back who had tested positive for COVID-19. (*Id.* ¶ A.1.) Inmates were also denied cleaning supplies for the one shower and two phones that were shared. (*Id.*) Inmates were refused cleaning supplies and did not receive them for eleven days despite the fact that the cells had urine or trash on the floor. (*Id.* ¶ A.2.) He was also denied grievances. (*Id.* ¶¶ A.2-3.) Heggs was not provided with sufficient food. (*Id.* ¶ A.4.)

---

[1]     Unless otherwise stated, references to page numbers in this Report and Recommendation refer to the CM/ECF page numbers.

On October 12, 2020, the commanding officer allowed staff to work without masks and inmates' time outside was reduced because they complained. (*Id.* ¶¶ A.5-6.) Bags of trash were left uncollected, cleaning supplies were not provided, no alternative meals were provided for those with allergies, and he was given insufficient free time from his cell. (*Id.* ¶¶ A.7-8.)

On October 13, 2020, Heggs was rushed into his cell after 27 minutes of being out of his cell, causing him to leave his food in a microwave. (*Id.* ¶ A.9.) He was told it would be brought to him, but complained that people were touching his bowls. (*Id.*)

On October 14, 2020, Heggs did not come out of his cell, even though no one had tested positive for COVID-19. (*Id.*) Inmates with allergies were not allowed an alternative meal, and were forced to eat the given meal and become sick or starve. (*Id.*) This issue was brought to the attention of Sergeant Emily by Corrective Officer Wherley, but the sergeant ignored the concerns. (*Id.*)

Between October 17, 2020 and October 21, 2020, inmates in cells on both sides of him had been complaining of COVID-19 symptoms to the corrective officers, but it took four days to test the inmates. (*Id.* ¶ A.10.) In addition, the windows were kept open making it cold in cells without providing inmates with coats. (*Id.* ¶ A.11.) Further, despite the fact that 90 people in the building had tested positive with COVID-19, inmates were not provided with cleaning supplies and trash was not emptied. (*Id.* ¶ A.12.) Grievances were ignored. (*Id.* ¶ A.13.)

On October 20, 2020, a corrective officer tied garbage bags to cell bars and then provided inmates their meals, which in some way involved Sergeant Julian. (*Id.* ¶ A.14.)

A nurse provided a finger heart rate gauge for inmates, but did not sanitize the gauge after each use.  (*Id.* ¶ A.15.)  A few of the staff were not wearing masks when operating the unit.  (*Id.* ¶ A.17.)  Inmate sheets were not cleaned for a month, inmates were not allowed to do other laundry for a month, and inmates were only allowed a shower once a week as part of the COVID-19 lockdowns.  (*Id.* ¶¶ A.17-19.)  Inmates were only allowed to leave their cells for up to 30 minutes each week.  (*Id.* ¶ A.20.)

Heggs was not allowed to move cells even though the inmates next to him tested positive for COVID-19.  (*Id.* ¶ A.21.)  Heggs also complained that the correctional officers ("CO" or "COs") did not want to talk to him, they did not bring tissues to inmates, one of the COs was coughing while bringing meals, the meals contained cheese despite his allergies, and Sergeant Julian ran over bags of garbage with food carts.  (*Id.* ¶¶ A.22-26.)

At some point Heggs was notified that he was positive for COVID-19, but received no medical attention.  (*Id.* ¶¶ A.27-29.)

On November 1, 2020, an inmate died from COVID-19, and the body remained in the day room while the other inmates were given lunch.  (*Id.* ¶ A.30.)

### 2.    Allegations Against the Individual Defendants

Heggs asserts Defendant Sergeant Julian violated his Fifth and Eighth Amendments and has sued him in his individual capacity.  (Dkt. 1-1 at 7.)  Sergeant Julian allowed COs to pass out food to inmates while they were coughing.  (*Id.* ¶ B.1.)  Sergeant Julian told his COs to not give his name because inmates warned of submitting grievances.  (*Id.* ¶ B.2.)  Sergeant Julian ran over full garbage bags using the food cart on

October 20, 2020. (*Id.* ¶ B.3.) On October 24, 2020, Sergeant Julian told Plaintiff that he was not on an alternative meal list, which was false, and Heggs discovered that he was not calling for the alternative meals. (*Id.* ¶ B.4.) Sergeant Julian failed to require his COs to wear masks as required and he would not supply cleaning supplies as needed. (*Id.* ¶ B.5.)

Heggs asserts Defendant CO Brown violated his Eighth and Thirteenth Amendment rights and sued him in his individual capacity. (*Id.* ¶ C.) CO Brown failed to wear his mask on October 12, 2020, as mandated, and retaliated when inmates talked to him about it by not allowing them time out of their cells. (*Id.* ¶ C.1.)

Heggs also asserts Defendant CO Fitz violated his Eighth and Thirteenth Amendment rights and has sued him in his individual capacity, on the basis that he failed to wear his mask on October 24, 2020, as mandated, and retaliated against inmates that talked to him about it by not allowing them time out of their cells. (*Id.* ¶¶ C.2-3.)

Heggs claims that CO/OIC Wagner violated his Eighth and Thirteenth Amendment rights and is suing her in her individual capacity for lying about losing inmates' alternative meals, not getting him anything to eat on multiple occasions, not giving inmates out-of-cell time, and failing to give cleaning supplies in order to prevent the spread of COVID-19. (*Id.* ¶ C.4.)

Heggs also asserts claims against Defendants Sergeant Emily, Sergeant Lasen and Sergeant Sugray in their individual capacities for violating his Fifth, Eighth, and Thirteenth Amendment rights. (*Id.* ¶ D.) These Defendants were informed multiple times regarding cleaning and sanitizing in light of COVID-19 and "blew" him and others

off. (*Id.* ¶ D.1.) These Defendants also refused to demand that their COs wear a mask and failed to discipline them for not wearing a mask. (*Id.* ¶ C.2.) These sergeants also refused to inform their lieutenants that the inmates wanted to speak with them and they themselves refused to talk to them or help them, which included refusing to respond to kites. (*Id.* ¶¶ D.3-4.) They also refused to bring tissues for days and cleaning supplies. (*Id.* ¶ D.5.) Heggs specifically complained that his sink had been "stopped up" for two months with no response. (*Id.*) They also failed to call the kitchen to get alternative meals for those who had food allergies. (*Id.* ¶ D.6.)

Heggs alleges that Lieutenant Spets, CPD Reed, and Sergeant Nerirer, violated his Fifth and Eighth Amendment rights in their individual capacities, by failing to respond to multiple kites and grievances, given that they were in the chain of command allowing them to resolve issues or allowing them to proceed to the next level[2]. (*Id.* ¶¶ E.1-5.)

**B.      Available Record**

**1.      COVID-19 Response at MCF-Stillwater**

Heggs was transferred to MCF-Stillwater from a different correctional facility on September 1, 2020. (Dkt. 30 ¶ 5.) All offenders transferred from a different correctional facility to MCF-Stillwater were placed in the segregation unit to quarantine for 14 days to help curb any spread of COVID-19 within the facility. (*Id.*) All offenders in quarantine

---

[2]      There is nothing in the record showing that these individuals were ever served, and therefore any such claims against them should be dismissed without prejudice pursuant to Rule 4(m) of the Federal Rules of Civil Procedure.

were provided masks.  (*Id*.)  If an offender needed a replacement mask, one was

provided.  (*Id*.)

In response to COVID-19, offenders and MDOC staff at MCF-Stillwater were

required to wear masks except when they were eating or drinking, when offenders were

alone in their cell, and when staff were alone in a private office.  (Dkt. 24 ¶ 8; Dkt. 26

¶ 6; Dkt. 27 ¶ 5.)  These requirements were in effect in September and October 2020, the

staff mask requirement has been strictly enforced, and violations could result in verbal or

written discipline.  (Dkt. 24 ¶ 8; Dkt. 26 ¶ 6; Dkt. 27 ¶ 5; Dkt. 28 ¶ 5.)  CO Fitzmaurice[3]

does not recall the specific dates Heggs alleges that he did not wear his mask, but

asserted he has always worn his mask unless he is eating or drinking, or if he needs to

catch his breath after engaging in a lot of activity, in which case he does so only if no one

is around.  (Dkt. 25 ¶ 2.)  Similarly, CO Brown does not remember the specific dates in

the fall of 2020 that Heggs alleges he did not wear a mask, but always wears a mask on

duty unless he is eating or drinking.  (Dkt. 23 ¶ 3.)

Julin, Emily, Larson, and Sugranis are all sergeants at MCF-Stillwater who

oversaw correctional officers at MCF-Stillwater to ensure that scheduled tasks, such as

recreation time and meals, were completed and that the safety and security of the facility

were maintained.  (Dkt. 24 ¶ 1; Dkt. 26 ¶ 1; Dkt. 27 ¶ 1; Dkt. 28 ¶ 1.)  Sergeants Julin,

Emily, Larson, and Sugranis assert that they were tasked with ensuring that COs followed

---

[3]    The Court notes that the spelling of some of Defendants' names differs between
the Complaint and their declarations, and uses the names as set forth in the declarations
going forward.

the mask rule, and have enforced the MDOC's mask requirement.  (Dkt. 24 ¶ 8; Dkt. 26 ¶ 6; Dkt. 27 ¶ 5; Dkt. 28 ¶ 5.)

With respect to cleaning at MCF-Stillwater in response to COVID-19, the prison hired additional offenders to clean the facility, called "swampers," who cleaned common areas several times per day, and wiped and disinfected frequently touched surfaces such as handrails and doorknobs multiple times per day, and cleaned each cell after an offender moved out and before another offender moved in.  (Dkt. 24 ¶ 6; Dkt. 26 ¶ 7; Dkt. 27 ¶ 4; Dkt. 29 ¶ 9; Dkt. 30 ¶ 9.)  These swampers removed trash from the common areas of MCF-Stillwater daily.  (Dkt. 24 ¶ 7; Dkt. 26 ¶ 3.)  Offenders were provided trash bags for their cells and could dispose of trash from their cells into trash receptacles in common areas when they were out of their cells.  (Dkt. 24 ¶ 7; Dkt. 26 ¶ 3; Dkt. 27 ¶ 3; Dkt. 28 ¶ 2.)  If offenders could not come out of their cells, they could tie any full garbage bags to the bars of their cell doors and swampers or staff would come by to dispose of the bags.  (Dkt. 24 ¶ 7; Dkt. 26 ¶ 3; Dkt. 27 ¶ 3; Dkt. 28 ¶ 2.)  Emily, Larson, and Sugranis claimed that they did not observe excessive garbage piling up in the A-West unit at MCF-Stillwater in September or October 2020.  (Dkt. 24 ¶ 7; Dkt. 27 ¶ 3; Dkt. 28 ¶ 2.)  Julin asserted that trash was removed from the common areas daily and could not pile up in a manner that it could be run over with a food cart.  (Dkt. 26 ¶ 4.)

Hand sanitizer was available to offenders throughout the facility and offenders could have bars of soap in their cells to wash their hands.  (Dkt. 24 ¶ 6; Dkt. 27 ¶ 4; Dkt. 28 ¶ 3; Dkt. 30 ¶ 10.)

Cleaning supplies were available to offenders when they were out of their cells to use to clean their cells.  (Dkt. 24 ¶ 6; Dkt. 27 ¶ 4; Dkt. 30 ¶ 10.)  These supplies were kept in a closet accessible to offenders, which was continuously stocked, and if an inmate could not come out of his cell and had a specific need for cleaning supplies, he could request that staff provide cleaning supplies and cleaning supplies would be provided.  (Dkt. 24 ¶ 6; Dkt. 27 ¶ 4; Dkt 28 ¶ 3.)  Tissue and toilet paper were also available to inmates.  (Dkt. 26 ¶ 7; Dkt. 27 ¶ 4; Dkt 28 ¶ 3.)

Julin claims that he never refused to provide Heggs with cleaning supplies or toilet paper and does not know of any correctional officers who have refused to provide Heggs with the same.  (Dkt. 26 ¶ 7.)  Wagner, Sugranis, and Larson do not recall Heggs ever asking them for cleaning supplies, and would have provided them had he requested such supplies.  (Dkt. 27 ¶ 4; Dkt. 28 ¶ 3; Dkt. 29 ¶ 4.)  If an offender told Julin, Larson, Emily, or Wagner that he was in need of cleaning supplies, soap, or toilet paper, they would provide those items to the offender, asked another staff member to provide those items, or directed the offender to where he can obtain those items.  (Dkt. 24 ¶ 7; Dkt. 26 ¶ 7; Dkt. 29 ¶ 4.)

While Heggs also alleges that an unnamed correctional officer was observed by Julin multiple times handing out food to offenders while coughing, Julin attested that he recalled one incident in October 2020 where he observed an officer wearing a mask coughing in a way that appeared to him to be possibly related to illness, and directed that the officer be removed from the floor to a place where he would not be interacting with offenders.  (Dkt. 26 ¶ 5.)  Julin let the watch commander, who is responsible for

overseeing all operations of the prison, know about the situation.  (*Id.*)  It was then the

watch commander's determination whether the officer would continue his regular duties,

be reassigned, or leave the facility, but Julin did not know what the watch commander

determined in this case.  (*Id.*)

Any offender testing positive for COVID-19 has immediately been placed on

isolation throughout the pandemic.  (Dkt. 30 ¶ 9.)  All offenders at MCF-Stillwater who

are identified as close contacts with an offender testing positive have also immediately

been placed in quarantine throughout the pandemic.  (*Id.*)  MCF-Stillwater's plan for

isolation and quarantine has changed to account for MCF-Stillwater's layout and the

number of cases of COVID-19 in the facility.  (*Id.*)  Initially, the plan was to quarantine

offenders in the segregation unit, however, as that unit became full, another living unit

for offender treatment was used for quarantine.  (*Id.*)  Due to the number of cases, by the

fall of 2020, it was impractical to confine each offender that tested positive or was a close

contact to a separate living unit, and the decision was made to confine those offenders to

their cells rather than move them to a different unit.  (*Id.*)  This decision concerning

isolation and quarantine, was made in consultation with the MDOC's Medical Director

and the Minnesota Department of Health.  (*Id.*).

Further, in response to the COVID-19 pandemic, offender recreation time at MCF-

Stillwater became more limited than previously in an effort to stop the spread of the virus

in the facility.  (Dkt. 30 ¶ 6.)  On October 12, 2020, offenders at MCF-Stillwater were

confined to their cells to curb the spread of COVID-19 in the facility.  (*Id.*)  During the

period from October 12 to October 19, 2020, offenders could launder their clothes in the sinks of their cells and air dry them in their cells if they wished to.  (Dkt. 30 ¶ 8.)

Beginning on October 19, 2020, cohorts of eight offenders at one time in the A-West unit would come out of their cells for 30 minutes of recreation time.  (*Id.*)  They could then shower, use the phones, or otherwise have recreation time.  (*Id.*)  This reduced time was implemented to mitigate the spread of COVID-19 in the facility while also providing offenders some time out of their cells.  (*Id.*)  The limited time for offenders to be out of their cells was gradually phased out at the end of October and in November 2020.  (*Id.*)

During the modified recreation time period beginning October 19, a cart was brought into each living unit once per week for offenders to exchange used linen for clean linen.  (*Id.* ¶ 7.)  Further, beginning on October 19, 2020, offenders were able to use washers and dryers when they were out for recreation time with their cohort.  (*Id.* ¶ 8.)  Offenders were able to wash their clothes in a washing machine and air dry their clothes in their cells.  (*Id.*)

### 2.    Meals

The MDOC has a policy for alternative meals and special meals at its facilities. (Dkt 24-1 at 1; Dkt. 30 ¶ 15.)  Alternative meals are lacto-ovo vegetarian meals, which do not contain meat, but may contain eggs and dairy.  (Dkt. 30 ¶ 15.)  These meals use dairy products, eggs, nuts, and legumes, including soybeans, to provide adequate protein and nutrition.  (Dkt. 24-1 at 1.)  Menus for alternative meals and regular meals are posted in common areas one week in advance.  (Dkt. 24 ¶ 4; Dkt. 30 ¶ 15.)  Offenders may then

sign up for an alternative meal on a certain day.  (Dkt. 24 ¶ 4.)  If an offender has a food allergy or other dietary needs, he may request a special meal diet through the MDOC's Health Services staff.  (Dkt. 24 ¶ 4; Dkt. 30 ¶ 15.)  Further, if Health Services approves the request, Health Services staff informs the kitchen in the facility where the offender is housed that the offender is to receive special medical meals.  (Dkt. 24 ¶ 4; Dkt. 30 ¶ 15.)

Wagner acknowledges in his declaration that Heggs claims that at some point in either September or October 2020, CO Shirley Wherley told him that Heggs should get an alternative or special meal, that he laughed, said he would look for Heggs's meal, but did not get Heggs anything to eat.  (Dkt. 29 ¶ 2.)  Wagner states that he however does not recall CO Wherley telling him anything about Heggs not receiving a meal at that time. (*Id.*)  Wagner stated that he would not laugh if an offender did not receive a meal and instead would call the kitchen to ask about the offender's meal or tell a sergeant about the situation.  (*Id.*)  That said, Wagner also states that he did not have the authority to direct the kitchen to prepare a meal for an offender and did not have the authority to plan or prepare offender meals.  (*Id.*)

Emily acknowledged Heggs's assertion that he and CO Wagner told CO Wherley to tell Heggs that they would try to find his alternative meal but the meal never came. (Dkt. 24 ¶ 4.)  Emily states that he does not recall looking for an alternative meal for Heggs.  (*Id.*)  However, Emily stated in his declaration that if he became aware that an offender was supposed to receive an alternative meal or a special medical meal, but did not receive one, he would call the kitchen to ask where the meal is.  (*Id.*)  Emily also

represented that he did not have the authority to direct the kitchen to prepare a meal for an offender and did not have the authority to plan or prepare offender meals. (*Id.*)

Julin acknowledges in his declaration that Heggs alleges that on October 24, 2020, Julin told Heggs he was not on an alternative meal list and otherwise prevented him from getting an alternative meal or looking into where his alternative meal was. (Dkt. 26 ¶ 8.) Julin does not specifically recall October 24, 2020, but represented that if an inmate told him he was supposed to have an alternative meal and the kitchen did not send one, he would call the kitchen to see what was going on and do his best to arrange for a meal. (*Id.*) That said, as a sergeant, Julin did not have the authority to order the kitchen to make a special meal for an offender. (*Id.*)

Similarly, Sugranis asserted that despite Heggs's claims that he refused to call the kitchen to ask about alternative meals, he did not recall Heggs informing him that he was supposed to receive an alternative meal but did not receive one. (Dkt. 28 ¶ 6.) Sugranis further states that if an offender told him he was supposed to receive a special meal or an alternative meal, but did not receive a meal, he would call the kitchen to ask about the meal and do his best to resolve the situation. (*Id.*) However, as a sergeant, he did not have the authority to direct the kitchen to send a particular meal to a living unit, or prepare a meal for an offender, and had no role in planning or preparing meals for offenders. (*Id.*)

Larson represents he does not remember Heggs ever telling him that he was supposed to receive an alternative meal or a medical meal and did not receive one. (Dkt. 27 ¶ 7.) He also asserted in his declaration that if he was told by staff or an offender that

an offender was supposed to receive an alternative meal or a medical meal, but did not, he would call staff in the kitchen to see where the meal was, but could not order the kitchen to prepare a specific meal for an offender and did not plan or prepare meals for offenders.  (*Id.*)

### 3.    Backed-up Sink

With respect to Heggs's allegations that the sink in his cell was backed up for two months, which he claims Larson, Emily, and Sugranis were aware of, they assert in their declarations that they were not aware of Heggs's sink being backed up, and do not recall Heggs raising this concern with them.  (Dkt. 24 ¶ 10; Dkt. 27 ¶ 6; Dkt. 28 ¶ 8.)  If they had been made aware of an issue with Heggs's sink, they would have placed a work order to have it repaired or otherwise informed appropriate staff.  (*Id.*)

### 4.    Heggs's Grievances

Grievances by inmates are submitted through inter-facility mail at MCF-Stillwater. (Dkt. 30 ¶ 12.)  There is an inbox in every living unit for offenders to send grievances. (*Id.*)  When a unit is on lockdown and offenders cannot come out of their cells, staff gather any offender grievances when they conduct security rounds.  (*Id.*)

With respect to Heggs's claims that Julin directed an officer not to give their name to Heggs so he could submit a grievance, Julin asserts he does not recall Heggs asking him for his name or the name of another officer, nor does he remember ever receiving a kite from Heggs.  (Dkt. 26 ¶¶ 9-10.)  If an offender asks for Julin's name, he shows the offender his DOC ID and he instructs COs he supervises to do the same.  (*Id.* ¶ 9.)  If Julin receives a kite from an offender, he addresses the issue raised in the kite in writing

or in person.  (*Id.* ¶ 10.)  If it is not an issue he can address, he directs the offender to the

person he should speak to or direct a kite to.  (*Id.*)

As to Heggs's complaints that Larson, Emily, and Sugranis refused to let him

speak to a lieutenant, refused to speak to him themselves, and refused to respond to his

kites, the sergeants do not remember receiving kites from Heggs.  (Dkt. 24 ¶ 9; Dkt. 27 ¶¶

8-9; Dkt. 28 ¶ 7.)  They also assert that when they receive a kite, they respond in some

form or another; if an inmate wishes to speak to Emily, Sugranis, or Larson, they will talk

to the inmate if they are able; and if an inmate wants to speak to a lieutenant, they attempt

to resolve the issue themselves and inform a lieutenant or tell the offender to write a kite

to a lieutenant if they cannot.  (Dkt. 24 ¶ 9; Dkt. 27 ¶¶ 8-9; Dkt. 28 ¶ 7.)  In addition,

Emily, Sugranis, and Larson either show an offender their DOC ID, or tell the offender

their name, when asked.  (Dkt. 24 ¶¶ 5; Dkt. 27 ¶ 10; Dkt. 28 ¶ 4.)  Sugranis recalls

Heggs asking for his name on one occasion and claims he showed Heggs his MNDOC

issued ID, which displays his rank and last name.  (Dkt. 28 ¶ 4.)

CO Fitzmaurice does not remember Heggs asking for his name, but asserts in his

declaration that if an offender asks for his name, he tells the inmate his name or he writes

it down for the offender.  (Dkt. 25 ¶ 3.)

With respect to allegation of retaliation based on grievances, COs Fitzmaurice,

Brown, and Wagner deny any such retaliation occurred and assert that they do not have

the authority to refuse to let offenders out for the scheduled recreation time.  (Dkt. 23 ¶ 4;

Dkt. 25 ¶ 3; Dkt. 29 ¶ 3.)

## II.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The moving party has the initial responsibility of demonstrating that there is no genuine issue of material fact to be decided.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  For a dispute about a material fact to be "genuine," the evidence must be such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby*, 477 U.S. 248 (1986).  In its review of the facts, the Court must consider the evidence in the light most favorable to the party opposing summary judgment.  *See Kneibert v. Thomson Newspapers, Michigan, Inc.*, 129 F.3d 444, 451 (8th Cir. 1997).

When a motion for summary judgment has been made and supported by the pleadings and affidavits as provided in Rule 56(c), the burden shifts to the party opposing the motion to proffer evidence demonstrating that a trial is required because a disputed issue of material fact exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  *Davenport v. Univ. of Ark. Bd. Of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).  "In evaluating the evidence at the summary judgment stage, we consider only those responses that are supported by admissible evidence."  *Duluth News-Tribune v. Mesabi Publ'g Co.,* 84 F.3d 1093, 1098 (8th Cir. 1996); *see also JRT, Inc. v. TCBY Sys., Inc.*, 52 F.3d 734, 737 (8th Cir. 1995) ("[A] successful summary judgment defense requires more than argument or

re-allegation; [the party] must demonstrate that at trial it may be able to put on admissible evidence proving its allegations.").  Indeed, Rule 56(c) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated" and a party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  *See* Fed. R. Civ. P. 56(c)(2), (4).

When ruling on a motion for summary judgment, the Court is not required to adopt the plaintiff's version of the facts when those facts are "so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them."  *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790 ( 8th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  "A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor' without resort to 'speculation, conjecture, or fantasy.'"  *Id.* at 790-91 (citations and internal quotation omitted).  When considering a motion to dismiss or for summary judgment, pleadings submitted by *pro se* litigants are held to less stringent standards than formal pleadings drafted by lawyers.  *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam).  Nevertheless, claims of even a *pro se* plaintiff cannot survive a motion for summary judgment unless the plaintiff has set forth specific facts demonstrating that there is a genuine issue for trial.  *See Quam v. Minnehaha Cty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987) ("Although Quam is entitled to the benefit of a liberal

construction of his pleadings because of his pro se status, Federal Rule of Civil Procedure 56 remains applicable to Quam's lawsuit.").

## III.  ANALYSIS

### A.  Claims Against the Minnesota Department of Corrections

Defendants argue that any claims for monetary damages against the MDOC and the individual defendants in their official capacities are barred by the Eleventh Amendment.  (Dkt. 22 at 22-23.)  With respect to injunctive relief, Defendants argue that any such relief requested is moot on the basis of Heggs's release from custody and otherwise improper with respect to the termination or suspension of the prison officials involved.  (*Id.* at 23-24.  Heggs's entire opposition to the Motion for Summary Judgment as to all claims is as follows:

> This file should not be in any form be tossed out just because these correctional officers abused the power that was trusted in them to abide by and they didn't. This file should not be tossed out simply because these correctional officers feel as though they can play the law and how they feel and have no repercussions should I apply to them for breaking the laws of the job they swore an oath to uphold. I was on the daily for months targeted life purposely put in danger and tortured as well as assaulted by detainees because they knew nothing would happen to them for doing so and nothing did happen to them while I was threatened and locked down. If I didn't drop the situation I was locked down more for reporting it to the police so they could obtain the video footage of what happened.

(Dkt. 34.)

The Court will proceed with addressing the claims against the MDOC and the individual defendants in their official capacities.[4]

---

[4]  The Court notes while Heggs is specifically suing prison officials in their individual capacities, and makes no mention of official capacity, the Court addresses

### 1.    The Official Capacity Claims Are Barred by the Eleventh Amendment

The Court recommends that Defendants' Motion for Summary Judgment be granted as to Heggs's claim for damages against the MDOC and any official capacity claims against the individual MDOC Defendants, as the claims for damages are precluded by the Eleventh Amendment.  The Eleventh Amendment states that the Court's jurisdiction does not "extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ."  U.S. Const. amend. XI.  The Eleventh Amendment also "bars suits against a State by citizens of that same State as well."  *Papasan v. Allain*, 478 U.S. 265, 276 (1986) (citation omitted).  The Eleventh Amendment generally bars suits for monetary damages against a state, unless that immunity has been waived by the state or expressly abrogated by Congress.  *See Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 (8th Cir. 1999).  An agency of the state, such as MDOC, is entitled to the same Eleventh Amendment immunity.  *See Grant*, 841 F.3d at 722 n.3 (8th Cir. 2016); *see also King v. Dingle*, 702 F. Supp. 2d 1049, 1069 (D. Minn. 2010) ("[T]he Eleventh Amendment bars actions, in Federal Court, which seek monetary damages from individual State Officers, in their official capacities, as well as State Agencies, because such lawsuits are essentially for the recovery of money from the state.") (citation omitted).  Courts within this District have previously concluded that the State of Minnesota has not waived its Eleventh Amendment immunity with respect to

---

official capacity claims against them, as the parties do not assert that such claims are not subsumed within the Complaint.

Section 1983 claims, and that in enacting Section 1983, Congress did not make a clear statement of intent to abrogate states' Eleventh Amendment immunity. *Smith v. Fabian*, No. CIV. 10-2193 JRT/TNL, 2012 WL 1004982, at *3 (D. Minn. Mar. 26, 2012); *Stahl Const. Co. v. State of Minn.*, No. 03-3104, 2004 WL 742058, at *3 (D. Minn. March 4, 2004).

Further, the Supreme Court has held that official capacity suits "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690, n.55 1978)). In other words, a suit against a state official in his or her official capacity "is no different from a suit against the State itself." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989) (citation omitted). "The Eleventh Amendment bars such suits unless the State has waived its immunity." *Id.* at 66. As stated previously, the State of Minnesota has not waived its sovereign immunity. *See Faibisch v. Univ. of Minnesota*, 304 F.3d 797, 800 (8th Cir. 2002). Thus, Heggs's claims against the MDOC and the individual Defendants in their official capacities for money damages are barred by the Eleventh Amendment.

### 2.    Request for Injunctive Relief

Similarly, summary judgment should be granted as to any claims for injunctive relief stemming from prison conditions as moot since Heggs is no longer subject to the conditions that gave rise to his claim by virtue of his release from prison. *See Hickman v. Missouri*, 144 F.3d 1141, 1142 (8th Cir. 1998) (citation omitted) (Section 1983 claims for injunctive relief based on prison conditions are rendered moot by inmate plaintiff's

release from prison).  Moreover, Heggs's request for the termination or suspension of the individual corrections officials based on their conduct as the aggrieved prison condition at issue falls outside of the scope of injunctive relief allowed, especially given his release. *See* 18 U.S.C. § 3626(a) ("Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."); *see also Nicholas v. Hunter,* 228 F. App'x 139, 141 (3rd Cir. 2007) ("The remaining relief requested is not available as the District Court lacks authority to order a federal investigation and prosecution of the defendants or the termination of their employment."); *Goulette v. Warren*, No. 3:06CV235-1-MU, 2006 WL 1582386, at *1 n.1 (W.D. N.C. June 1, 2006) ("The Court notes that even if Plaintiff's claims prevailed in this case, this Court would not, based upon this law suit, have the authority to order the termination of the Defendant's employment or to grant Plaintiff an immediate, early release from jail."); *Merrida v. California Dep't of Corr*., No. 1:06-CV-00502 OWW LJO P, 2006 WL 2926740, at *1 n.1 (E.D. Cal. Oct. 11, 2006) (finding that where plaintiff prays for the termination of defendant's employment, "the court cannot award this form of relief to plaintiff.") (citing 18 U.S.C. § 3626(a)(1)(A).

For all of these reasons, Defendants' Motion for Summary Judgment as to Heggs's requests for prospective relief should be granted.

## B.     Claims Against CO Padelford

Defendants argued that summary judgment should be granted as to the claims against CO Padelford because the Complaint makes no reference to any illegal conduct

by him, only references him in the caption, and Heggs has presented no evidence regarding how CO Padelford violated Heggs's constitutional rights. (Dkt. 22 at 13-14.)

"Government officials are personally liable only for their own misconduct." *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015). The doctrine of vicarious liability is inapplicable in Section 1983 suits. *See Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (citation omitted). "Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." *Clemmons v. Armontrout,* 477 F.3d 962, 967 (8th Cir. 2007); *see also Ellis v. Norris*, 179 F.3d 1078, 1079 (8th Cir. 1999) (noting that plaintiff pursuing claims under Section 1983 must "allege facts supporting any individual defendant's personal involvement or responsibility for the violations") (citations omitted); *Jackson v. Nixon*, 747 F.3d 537, 545 (8th Cir. 2014) (finding that a plaintiff "must plead facts that plausibly show direct involvement... in the formation, implementation, or enforcement of that policy."). "[T]o succeed on a personal-capacity claim under § 1983, a litigant must prove that the specific defendant being sued acted unlawfully himself or herself." *See Washington v. Craane*, No. 18-CV-1464 (DWF/TNL), 2019 WL 2147062, at *2 (D. Minn. Apr. 18, 2019) (citation omitted) Where defendants as government officials had no "direct participation" in the alleged acts, they are entitled to qualified immunity. *See Mendoza v. United States Immigration & Customs Enf't*, 849 F.3d 408, 418 (8th Cir. 2017).

Heggs makes no mention of CO Padelford in his Complaint, other than including him as a defendant, and his response offers no evidence (and in fact does not mention CO Padelford) with respect to his alleged involvement with violating Heggs's constitutional

rights necessary to survive summary judgment.  Therefore, Defendants' Motion for Summary Judgment with respect to CO Padelford should be granted.

## C.    Remaining Individual Defendants

As stated previously, the focus of Heggs's claims under 42 U.S.C. § 1983 against the individual sergeants and COs is related to their actions or inaction leading to the complained-of conditions of his previous confinement and his inability to properly assert grievances related to those conditions.

The Supreme Court has laid out qualified immunity's parameters as follows:

Under our precedents, officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time." "Clearly established" means that, at the time of the officer's conduct, the law was "'sufficiently clear' that every 'reasonable official would understand that what he is doing' " is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct "beyond debate." This demanding standard protects "all but the plainly incompetent or those who knowingly violate the law."

To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority.'" It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that "every reasonable official" would know.

The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." This requires a high "degree of specificity." We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." A rule

is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established."

*D.C. v. Wesby*, 138 S. Ct. 577, 589-90 (2018) (internal citations omitted).  A government official is entitled to qualified immunity **unless "both of these questions are answered affirmatively**."  *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015) (cleaned up) (emphasis added).  "To defeat a motion for summary judgment based on qualified immunity, the plaintiff must put forth facts showing that the officer's conduct violated a constitutional right, and that the right was clearly established at the time of the alleged misconduct."  *Johnson v. Moody*, 903 F.3d 766, 773 (8th Cir. 2018) (citation omitted).  "The district court has discretion to decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'"  *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Given this standard, the Court will proceed with determining whether the individual Defendants are entitled to qualified immunity.

### 1.    Heggs's COVID-19 Related Claims

Defendants argue that based on the undisputed facts, the individual Defendants were not deliberately indifferent to a serious risk of harm posed by COVID-19 in violation of the Eighth Amendment.  (Dkt. 22 at 14-17.)

To state a claim for a violation of an inmate's right to be free from cruel and unusual punishment under the Eighth Amendment,[5] the complaint must state how prison

---

[5]    The Court notes that Plaintiff has also asserted relief against these state actors under the Fifth Amendment and the Thirteenth Amendment.  However, the Fifth Amendment applies only to federal officials, not to the state officials whom Heggs has

24

officials failed to provide humane conditions of confinement such as inadequate food, shelter, medical care, and safety. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "To prove an Eighth Amendment violation, a prisoner must satisfy two requirements, one objective and one subjective." *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008)). "The first requirement tests whether, viewed objectively, the deprivation of rights was sufficiently serious." *Id.* (citation omitted). "The second requirement is subjective and requires that the inmate prove that the prison officials had a 'sufficiently culpable state of mind.'" *Id.* (citation omitted). "Eighth Amendment cases are analyzed in light of the specific claim raised." *Id.*

To succeed on a failure-to-protect claim under the Eighth Amendment, a prisoner must show (1) they are incarcerated under conditions posing a substantial risk of serious harm and (2) the prison officials subjectively knew of and disregarded that safety risk. *Smith v. Arkansas Dep't of Corr.*, 103 F.3d 637, 644 (8th Cir. 1996). "In prison conditions claims, which include threats to an inmate's health and safety, the subjective inquiry is whether the prison officials were deliberately indifferent to a serious risk of harm to the inmate." *Irving*, 519 F.3d at 446; *see also Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006) (holding that deliberate indifference test applies to a claim challenging the adequacy of precautionary measures to reduce the risk of infection.).

---

sued. *See Dusenbery v. United States,* 534 U.S. 161, 167 (2002). Moreover, the Fifth and Thirteenth Amendment claims are appropriately examined under an Eighth Amendment analysis, which provides the appropriate framework for analysis. *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 842-43 (1998) (where plaintiff based § 1983 claim on a number of amendments, only the Eighth Amendment provided the appropriate framework for analysis) (citing *Graham v. Connor*, 490 U.S. 386, 393 (1989)).

"The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the inference." *Riley v. Olk-Long*, 282 F.3d 592, 595 (8th Cir. 2002) (cleaned up).

The Court assumes for purposes of the Rule 56 analysis that infection with COVID-19 poses an objectively serious medical risk to Heggs, even though he does not provide any evidence that he is in any specific risk category as set forth by the CDC, especially since Defendants do not contest this point. *See Mohammed S. v. Tritten*, No. 20-CV-793 (NEB/ECW), 2020 WL 2750836, at *22 (D. Minn. Apr. 28, 2020) ("With respect to the objective prong, the available evidence establishes that COVID-19 is a highly communicable disease that presents a potentially mortal risk, particularly for high-risk individuals such as those Petitioners with risk factors identified by the CDC."), *R. & R. adopted,* No. 20-CV-783 (NEB/ECW), 2020 WL 2750109 (D. Minn. May 27, 2020).

The question then becomes whether summary judgment is appropriate based on the subjective prong of the analysis under the Eighth Amendment. "The subjective prong of deliberate indifference is an extremely high standard that requires a mental state of more than gross negligence," namely, a "mental state akin to criminal recklessness." *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016) (citations and quotations omitted); *see also Barton v. Taber*, 908 F.3d 1119, 1124 (8th Cir. 2018) (citations and quotations omitted) ("To demonstrate that a defendant actually knew of, but deliberately disregarded, a serious medical need, the plaintiff must establish a mental state akin to criminal recklessness: disregarding a known risk to the arrestee's health.") (cleaned up). Moreover, deliberate indifference must be more than simply a disagreement regarding

26

medical judgment or with treatment decisions.  *See Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006) (citing *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995)). Indeed, where "proscriptive action designed to alleviate the medical need has been provided and the dispute is over the adequacy of the treatment or preventative steps taken, federal courts 'are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" *Jorge V.S. v. Green*., No. CV 20-3675 (SDW), 2020 WL 1921936, at *3 (D.N.J. Apr. 21, 2020) (quoting E*verett v. Nort*, 547 F. App'x 117, 121 (3d Cir. 2013), quoting *United States ex rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)).  Further, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

A supervisor may be held liable under Section 1983 if he was personally involved in a constitutional violation or if his corrective inaction amounts to deliberate indifference.  *See Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997).  With respect to Heggs's claims that Sergeants Julin, Emily, Larson, and Sugranis failed to require their subordinate officers to wear masks and failed to discipline them when this occurred, Heggs has failed to provide any competent evidence that these sergeants were deliberately indifferent to a violation.  The only evidence before the Court is that in response to COVID-19, offenders and DOC staff at MCF-Stillwater were required to wear masks except when they are eating or drinking, when offenders are alone in their cell, and when staff are alone in a private office.  (Dkt. 24 ¶ 8; Dkt. 26 ¶ 6; Dkt. 27 ¶ 5;

Dkt. 28 ¶ 5.)  The evidence is that these requirements were in effect in September and
October 2020, and the staff mask requirement has been enforced, and violations could
result in verbal or written discipline.  (Dkt. 24 ¶ 8; Dkt. 26 ¶ 6; Dkt. 27 ¶ 5; Dkt. 28 ¶ 5.)
Moreover Sergeants Julin, Emily, Larson, and Sugranis have all represented that they
have enforced the MDOC's mask requirement.  (Dkt. 24 ¶ 8; Dkt. 26 ¶ 6; Dkt. 27 ¶ 5;
Dkt. 28 ¶ 5.)  With respect to the allegations that Sergeant Julian allowed a CO to pass
out food to inmates while they were coughing (Dkt. 1-1 ¶ B.1), the undisputed evidence
in the record does not support a finding that he was deliberately indifferent to a violation.
As Julin attested, he recalled one incident in October 2020, when he observed an officer
wearing a mask coughing in a way that appeared to him to be possibly related to illness,
and directed that the officer be removed from the floor to a place where he would not be
interacting with offenders.  (Dkt. 26 ¶ 5.)  Julin let the watch commander, who is
responsible for overseeing all operations of the prison, know about the situation.  (*Id.*)  It
was then the watch commander's determination whether the officer would continue his
regular duties, be reassigned, or leave the facility, but Julin did not know what the watch
commander determined in this case.  (*Id.*)  In other words, to the extent that the unnamed
officer improperly continued to work after being removed from the floor, it was not due
to the actions of Sergeant Julin and therefore no reasonable jury could find, given the
available record, that Sergeant Julin was deliberately indifferent to Heggs's safety.

 With respect to Heggs's claims that COs Brown and Fitzmaurice failed to wear
masks on a number of occasions, summary judgment is also appropriate as to these
claims given the available evidence in the record that the COs complied with the

MDOC's mask requirement.  (Dkt. 23 ¶ 3; Dkt. 25 ¶ 2.)  Moreover, even if COs Brown and Fitzmaurice failed to wear masks on a number of occasions, this alone cannot give rise to an Eighth Amendment claim that can survive summary judgment in the absence of evidence as to where the COs were located relative to Heggs or how long they were maskless, and how all this increased the risk to Heggs of contracting COVID-19 or how he was otherwise injured.  *See Ross v. Russell*, No. 7:20-CV-000774, 2022 WL 767093, at *14 (W.D. Va. Mar. 14, 2022); *see also Reinhardt v. Hogan*, No. DCK-20-1011, 2021 WL 82894, at *6 (D. Md. Jan. 11, 2021) ("[T]he Eighth Amendment is not violated when every conceivable protective measure is put into place to prevent the spread of a contagious disease and there are isolated lapses in implementation that cause no injuries.").

The Court also finds that summary judgment is appropriate for Heggs's Eighth Amendment claims regarding a lack of cleaning supplies.  The only support before the Court with respect to Heggs's claim in this regard are the allegations in his Complaint that Wagner, Julian, Emily, Larson, and Sugranis refused to bring tissues and/or cleaning supplies.  However, a "plaintiff may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor' without resort to 'speculation, conjecture, or fantasy.'"  *Reed*, 561 F.3d at 790-91 (citations and internal quotation omitted).  The undisputed evidence before the Court is that during the relevant period inmates at MCF-Stillwater could obtain cleaning supplies when they were out of their cells.  (Dkt. 24 ¶ 6; Dkt. 27 ¶ 4; Dkt. 30 ¶ 10.)  These supplies were kept in a closet accessible to inmates,

which was continuously stocked, and if an inmate could not come out of his cell and had a specific need for cleaning supplies, he could request that staff provide cleaning supplies and cleaning supplies would be provided.  (Dkt. 24 ¶ 6; Dkt. 27 ¶ 4; Dkt 28 ¶ 3.)  Tissue or toilet paper were also available to inmates. (Dkt. 26 7 ¶ 7; Dkt. 27 ¶ 4; Dkt 28 ¶ 3.)  Moreover, the individual Defendants all dispute that they refused to provide Heggs with cleaning supplies or tissues and asserted they would have either provided the supplies, directed another staff member to retrieve the items, and/or instructed the inmate where to find them.  (Dkt. 24 ¶ 6; Dkt. 26 ¶ 7; Dkt. 27 ¶ 4; Dkt. 28 ¶ 3; Dkt. 29 ¶ 4.)  Based on this record, the Court cannot find deliberate indifference on the part of Defendants, let alone negligence, and on this basis summary judgement should be granted

### 3.    Other Conditions of Confinement

Defendants argue that Heggs's allegations that the individual Defendants' actions or inaction allowed garbage to pile up, claims that Julin ran over a bag of trash with a food cart on one occasion and that he observed a CO tying trash bags and then passing out food or did that himself, that his complaints regarding a backed up sink were ignored, and his claims that he did not receive an alternative meal on a few occasions do not amount to Eighth Amendment violations.  (Dkt. 22 at 17-18.)

The Eighth Amendment prohibits "cruel and unusual punishment," U.S. Const. amend. VIII, and requires that "prisoners [must] be provided humane conditions of confinement, to include adequate food, clothing, shelter, and medical care," *LaDoucer v. Sherburne Ct. Jail*, Civil No. 08-4839 JNE/AJB, 2009 WL 5469900, at *6 (D. Minn. Nov. 19, 2009) (citing *Simmons v. Cook*, 154 F.3d 805, 807 (8th Cir. 1998).  "However,

the Constitution 'does not mandate comfortable prisons.'" *Jackson v. Mike-Lopez*, No.

17-4278 (JRT/BRT), 2018 WL 6696296, at *2 (D. Minn. Dec. 20, 2018) (quoting R*hodes*

*v. Chapman*, 452 U.S. 337, 349 (1981)).  As the Eighth Circuit has explained:

> To establish that a prisoner's conditions of confinement violate the Eighth
> Amendment, the prisoner must show that (1) the alleged deprivation is,
> "objectively, sufficiently serious," resulting "in the denial of the minimal
> civilized measure of life's necessities," and (2) that the prison officials were
> deliberately indifferent to "an excessive risk to inmate health or safety,"
> meaning that the officials actually knew of and disregarded the risk.  *Id.* at –
> ––––, ––––, 114 S. Ct. at 1977, 1979 (internal quotation marks and citations
> omitted).  Absent a showing that the prison officials consciously understood
> that prison conditions created such an excessive risk, the conditions are not
> a "punishment" within the meaning of the Eighth Amendment.  *Id.* at ––––,
> 114 S. Ct. at 1979.

*Williams v. Delo,* 49 F.3d 442, 445 (8th Cir. 1995)  The Eighth Circuit has determined

that depriving inmates of underwear, blankets, and a mattress (thereby forcing them to

sleep on a concrete slab) until they demonstrated "satisfactory behavior" as part of a

"progressive four-day behavior program" (that may last longer than four days)—did not

amount to the "denial of the minimal civilized measures of life's necessities," even when

that inmate " 'bottomed out' emotionally and suffered from temporary depression" while

in the program.  *O'Leary v. Iowa State Men's Reformatory*, 79 F.3d 82, 84-85 (8th Cir.

1996).  Similarly, placing an inmate in a "strip cell" where an inmate was deprived of

running water, "any clothing or bedding," "a tooth brush, tooth paste, deodorant, soap,

sheets, blankets, pillow cases, pillows, mattresses, his legal mail, and clothing" was

insufficient to show "the conditions in the strip cell denied him 'the minimal civilized

measure of life's necessities,'" where the inmate was "given three meals a day, including

liquid nourishment in the form of milk, and was sheltered from the elements." *Williams*

*v. Delo*, 49 F.3d 442, 444-46 (8th Cir. 1995).  That said, "inmates are entitled to

reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly

over a lengthy course of time."  *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989)

(citations omitted).

### a.   Garbage

Plaintiff alleges that Sergeant Julian ran over a garbage bag with a food cart on

October 20, 2020, and that he was somehow involved with the tying of garbage bags to

cell bars and then providing inmates with their meals.  First, Plaintiff provides no

evidence these incidents involved his food or even if they did, how they amounted to an

objectively and sufficiently serious deprivation.  The evidence in the record is that with

respect to cleaning at MCF-Stillwater in response to COVID-19, the prison hired

additional offenders to clean the facility, called "swampers," who removed trash from the

common areas of MCF-Stillwater daily.  (Dkt. 24 ¶ 7; Dkt. 26 ¶ 3.)  Offenders were

provided trash bags for their cells and could dispose of trash from their cells into trash

receptacles in common areas when they were out of their cells.  (Dkt. 24 ¶ 7; Dkt. 26 ¶ 3;

Dkt. 27 ¶ 3; Dkt. 28 ¶ 2.)  If offenders could not come out of their cells, they could tie

any full garbage bags to the bars of their cell doors and swampers or staff would come by

to dispose of the bags.  (Dkt. 24 ¶ 7; Dkt. 26 ¶ 3; Dkt. 27 ¶ 3; Dkt. 28 ¶ 2.)  Emily,

Larson, and Sugranis claimed that they did not observe excessive garbage piling up in the

A-West unit at MCF-Stillwater in September or October 2020.  (Dkt. 24 ¶ 7; Dkt. 27 ¶ 3;

Dkt. 28 ¶ 2.)  Julin asserted that trash was removed from the common areas daily and

could not pile up in a manner that it could be run over with a food cart and that he did not

recall the incident where Heggs alleges he did not intervene after a correctional officer tied up full garbage bags and then handed out food to offenders. (Dkt. 26 ¶¶ 3-4.) Even assuming that Julian ran over the garbage and did not intervene, there is nothing in the record supporting that this was anything more than negligence or gross negligence on the part of Julian as opposed a reckless disregard for a known risk to Heggs's health. For all of these reasons, the motion for summary judgment should be granted as to this claim.

      **b.**    **Backed-Up Cell Sink**

There is no dispute that an adequate quality and quantity of water for drinking and basic personal hygiene is a minimal life necessity. *See Scott v. Carpenter*, 24 F. App'x 645, 647-48 (8th Cir. 2001). Here, Plaintiff alleges that his cell sink was clogged during unspecified dates and that Larson, Emily, and Sugranis were aware of this issue. Heggs provided no evidence to support this assertion, while Larson, Emily, and Sugranis contest in their declarations that they were never notified by Heggs's regarding a backed-up sink. (Dkt. 24 ¶ 10; Dkt. 27 ¶ 6; Dkt. 28 ¶ 8.) Summary judgment should be granted on the issue of whether there was an objectively serious condition or deliberate indifference on the part of Larson, Emily, and Sugranis as to a dangerous condition on this basis alone. Moreover, there is no assertion that Heggs did not have access to adequate water for drinking and basic personal hygiene from other sources due to the fact that his sink was backed up. "Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (marks and citations

omitted).  Assuming that the sink was backed up (without knowing what that exactly entails given the lack of any information from Plaintiff), such a situation may have been unfortunate, however, the Court cannot conclude that the "minimal civilized measure of life's necessities" includes uninterrupted access to an unclogged sink.  *See Jelinek v. Roth*, 33 F.3d 56, 1994 WL 447266 at *1 (7th Cir. 1994) (unpublished) ("First, Jelinek complains that the plumbing in his cell produced only water contaminated with rust that was undrinkable and unsuitable for bathing.  This allegation does not implicate the Eighth Amendment. Jelinek does not allege that he was refused drinking water or prevented from bathing.  Nothing in the Constitution requires that each prisoner be provided with clean, cold, warm, or any other form of running water in his cell although in recent history some improvements have been made."); *see also Smith v. Copeland*, 892 F. Supp. 1218, 1230 (E.D. Mo. 1995) (turning off water in a cell except for brief periods to flush the toilet, and providing drinking water with each meal did "not deprive plaintiff of minimally necessary drinking water or hygienic requirements"), *aff'd*, 87 F.3d 265 (8th Cir. 1996).  For all of these reasons, the Court finds that Defendants Larson, Emily, and Sugranis are entitled to qualified immunity on this issue and that summary judgment should be granted with respect to Eighth Amendment claim involving the backed-up sink.

### c.   Alternative Meals

Plaintiff appears to allege that he has a dairy allergy.  (Dkt. 1-1-¶ A.24.)  Plaintiff alleges that CO Wherely, and Sergeants Julin, Emily, Larson, and Sugranis failed to call and/or address the lack of alternative meals on several occasions.  Defendants argue that alternative meals were not meant for inmates with dairy allergies and Heggs could have

requested a special meal diet based on a dairy allergy, but there is no evidence or allegation that he did so, and in any event, Emily, Julin, Wagner, Larson, and Sugranis do not recall being made aware that Heggs should have received an alternative meal or special meal, and if they had been made aware of such a situation, they would have contacted the kitchen to inquire as to the meal's status.  (Dkt. 22 at 19.)

A failure to provide adequate nutrition can amount to deliberate indifference for the purposes of the Eighth Amendment.  *See Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992) (citation omitted) (recognizing that prisoners have a right to adequate nutrition and that failure to provide adequate nutrition may qualify as deliberate indifference, but the prisoner must show "that the food he was served was nutritionally inadequate or prepared in a manner presenting an immediate danger to his health, or that his health suffered as a result of the food").  With respect to his claimed dairy allergy, Heggs must demonstrate (1) that he "suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs."  *See Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997).  In this case, Heggs has provided no medical evidence to the Court that he suffers from a dairy allergy or any other food related allergies.  The policy before Court from the MNDOC is that if an offender has a food allergy or other dietary needs, he may request a special meal diet through the DOC's Health Services staff.  (Dkt. 24 ¶ 4; Dkt. 30 ¶ 15.)  Further, if Health Services approves the request, Health Services staff informs the kitchen in the facility where the offender is housed that the offender is to receive special medical meals. (Dkt. 24 ¶ 4; Dkt. 30 ¶ 15.)  There is simply no evidence of that here.  Although Heggs attaches a kite to his

Complaint (Dkt. 1-1 at 14) letting kitchen staff know he had not received a meal addressing a number of allergies, even assuming that this constitutes competent evidence for the purposes of summary judgment, there is still no actual evidence of any allergies or for that matter that the individual Defendants knew in this case he was not receiving any medically required meals.  (Dkt. 24 ¶ 4; Dkt. 26 ¶ 8; Dkt. 27 ¶ 7; Dkt. 28 ¶ 6; Dkt. 29 ¶ 2.)

Given the lack of any evidence of an objective medical condition or knowledge of such on the part of Defendants, Heggs has failed to raise a genuine dispute of fact from which a trier of fact could conclude that the prison officials had been deliberately indifferent to his serious medical needs.  As such, Defendants are entitled to qualified immunity and summary judgment as to this claim should be granted.

### 4.      Grievances

Defendants argue they are entitled to summary judgment as to Heggs's grievance related claims on the basis that he is not entitled to a grievance process under the Constitution and because there is not support in the record that the individual Defendants ignored or attempted to avoid the grievance process.  (Dkt. 22 at 20.)  The gravamen of Heggs's claims is that Sergeants Emily, Larson, and Sugranis, refused to talk to him and other inmates, refused to tell their lieutenants that they wanted to talk to them, or otherwise failed to respond to his kites.  In addition, he claims that COs Brown, Wagner, and Fitzmaurice retaliated against him and other inmates by not allowing them time out of their cells when they complained about their failure to wear masks.

No constitutional right is violated solely by a failure to process grievances.  *See Buckley v. Barlow,* 997 F.2d 494, 495 (8th Cir. 1993) (citation omitted); *see also Fallon v. Coulson*, 5 F.3d 531, 1993 WL 349355, at *1 (8th Cir. 1993) (unpublished opinion) (stating that the failure of defendants "to acknowledge receipt of and respond to plaintiffs' grievances pursuant to prison procedure did not violate any of plaintiffs' constitutional rights"); *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991) (per curium) (citation omitted) ("When the claim underlying the administrative grievance involves a constitutional right, the prisoner's right to petition the government for redress is the right of access to the courts, which is not compromised by the prison's refusal to entertain his grievance").  That said, the Court acknowledges that the Supreme Court has explained that the Prisoner Litigation Reform Act "mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions."  *Ross v. Blake*, 578 U.S. 632, 638 (2016) (citing 42 U.S.C. § 1997e(a)). The Supreme Court went on to "underscore that statute's built-in exception to the exhaustion requirement: A prisoner need not exhaust remedies if they are not 'available.'"  *Id.* at 636.  Here, Heggs was able to redress his grievances as part of the present lawsuit and he has not provided any evidence, let alone alleged any injury to his ability to access the courts with respect to the issues raised as to his grievances or attempted grievances.  *See Lewis*, 518 U.S. at 349 (holding an inmate alleging denial of access to the courts must be able to demonstrate "actual injury" that his non-frivolous legal claim had been frustrated or was being impeded).  In addition, the evidence before the Court is that the named

individual defendants did not impede or attempt to otherwise avoid Heggs's grievances. (Dkt. 24 ¶ 9; Dkt. 25 ¶ 3; Dkt. 26 ¶¶ 9-10 Dkt. 27 ¶¶ 8-10; Dkt. 28 ¶¶ 4, 7.)

The Court also acknowledges that retaliation in response to a prisoner grievance can be actionable under Section 1983. *See Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir. 1989). In this case, it is Heggs's assertion that Fitzmaurice, Brown, and Wagner retaliated against inmates due to his complaints about them not wearing masks by not letting inmates out of their cells, however, the evidence in the record is that these Defendants do not even have the authority to refuse to let offenders out for the scheduled recreation time. (Dkt. 23 ¶ 4; Dkt. 25 ¶ 3; Dkt. 29 ¶ 3.)

For all of these reasons, the Court finds that summary judgment should be granted with respect to his grievance-related claims against the Defendants in their individual capacities.

## IV.   RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1.    Defendants' Motion for Summary Judgment (Dkt. 21) be **GRANTED**;

2.    Plaintiff's claims for monetary damages against Defendant Minnesota Department of Corrections and the individual Defendants in their official capacities be **DISMISSED WITHOUT PREJUDICE** for lack of jurisdiction as barred by the Eleventh Amendment;[6]

---

[6]    *See Herta v. McBride*, No. CV 21-1956 (DSD/HB), 2021 WL 5001792, at *2 (D. Minn. Sept. 30, 2021), *appeal dismissed*, No. 21-3353, 2022 WL 802694 (8th Cir. Jan. 4,

3.    Plaintiff's claims for prospective relief be **DISMISSED WITH PREJUDICE**;

4.    The claims against Defendant Sergeant Padelford in his individual capacity be **DISMISSED WITHOUT PREJUDICE**;

5.    The claims against Lieutenant Spets, CPD Reed, and Sargent Nerirer be **DISMISSED WITHOUT PREJUDICE**; and

6.    The claims against all other Defendants in their individual capacities be **DISMISSED WITH PREJUDICE**.


Dated: July 22, 2022                     *s/Elizabeth Cowan Wright*
                                         ELIZABETH COWAN WRIGHT
                                         United States Magistrate Judge



## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).

---

2022), *cert. denied,* 142 S. Ct. 2713 (2022) ("The Eleventh Amendment therefore strips the court of jurisdiction over Herta's § 1983 claims, and the court dismisses those claims without prejudice.").